INLAND EMPIRE WATERKEEPER
Colin Kelly (Bar No. 266956)
      Email: colin@iewaterkeeper.org
6876 Indiana Avenue, Suite D
Riverside, California 92506
Telephone: (951) 530-8823
Facsimile: (951) 530-8824

*Attorneys for Plaintiffs*
INLAND EMPIRE WATERKEEPER and ORANGE COUNTY COASTKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, a program of ORANGE COUNTY COASTKEEPER; ORANGE COUNTY COASTKEEPER, a California non-profit corporation; <br><br>        Plaintiffs, <br>   vs. <br><br> MARUHACHI CERAMICS OF AMERICA, INC., a California corporation; DELILAH PROPERTIES, INC. a California corporation; <br><br>        Defendant. | Civil Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.)** |

ORANGE COUNTY COASTKEEPER
Colin Kelly (Bar No. 266956)
        Email: colin@coastkeeper.org
3151 Airway Avenue, Suite F-110
Costa Mesa, CA 92626
Telephone:  (714) 850-1965
Facsimile:  (714) 850-1592

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Inland Empire Waterkeeper and Orange County Coastkeeper (collectively "Waterkeeper" or "Plaintiffs"), by and through their counsel, hereby allege:

## I.      JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On May 14, 2014, Waterkeeper issued a sixty (60) day notice letter of intent to sue ("Notice Letter") to Maruhachi Ceramics of America, Inc. ("Defendant") for its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ*) (hereinafter "Storm Water Permit") and the Clean Water Act. The Notice Letter informed Defendant of Waterkeeper's intent to file suit against it to enforce the Storm Water Permit and the Clean Water Act.

3.     The Notice Letter was also sent to the registered agent for Defendant, the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1). The Notice Letter is attached hereto as Exhibit 1 and is incorporated herein by reference.

4.     More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Waterkeeper is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this complaint. *See* 33

1   U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty

2   under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

3        5.      Venue is proper in the Central District of California pursuant to Section

4   505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are

5   located within this judicial district.

6   **II.   INTRODUCTION**

7        6.      This complaint seeks relief for Defendant's substantive and procedural

8   violations of the Storm Water Permit and the Clean Water Act resulting from

9   Defendant's operations at 1985 Sampson Avenue, Corona, CA 92879 ("MCA Facility"

10  or "Facility").[1]

11       7.      Waterkeeper specifically alleges that Defendant's discharges of pollutants

12  from the MCA Facility into waters of the United States; violations of the filing,

13  monitoring and reporting, and best management practice requirements; and violations of

14  other procedural and substantive requirements of the Storm Water Permit and the Clean

15  Water Act are ongoing and continuous.

16  **III.   LEGAL BACKGROUND**

17        **A.    The Clean Water Act.**

18        8.      Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the

19  discharge of any pollutant into waters of the United States unless the discharge complies

20  with various enumerated sections of the CWA. Among other things, section 301(a)

21  prohibits discharges not authorized by, or in violation of, the terms of a National

22  Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section

23  402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

24        9.      The Clean Water Act requires point source discharges of pollutants to

25  navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R.

26  § 122.26(c)(1).

27  _____

28  [1] The MCA Facility is described in Section V below, and in the Notice Letter attached
    hereto as Exhibit 1.

Complaint                             4

10.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

11.     The "discharge of a pollutant" means, among other things, the addition of a pollutant to waterways of the United States from any "point source." *See* 40 C.F.R. § 122.2.

12.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

13.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

14.     The EPA promulgated regulations for the section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

15.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

16.     A significant nexus is established if the "[receiving waters], either alone or

in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

17.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

18.     Section 505(a)(1) of the Clean Water Act provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

19.     Maruhachi Ceramics of America, Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

20.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

21.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

22.     Section 505(d) of the Clean Water Act allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. *See* 33 U.S.C. § 1365(d).

**B.     California's Storm Water Permit.**

23.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

24.     Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with

1    approved NPDES permit programs are authorized by Section 402(b) to regulate industrial

2    storm water discharges through individual NPDES permits issued to dischargers and/or

3    through the issuance of a statewide general NPDES permit applicable to all industrial

4    storm water dischargers. *See id.*

5          25.    California is a state authorized by EPA to issue NPDES permits.

6          26.    In California, the State Board is charged with regulating pollutants to protect

7    California's water resources. *See* Cal. Water Code § 13001.

8          27.    The Storm Water Permit is a statewide general NPDES permit issued by the

9    State Board pursuant to section 402 of the Clean Water Act. 33 U.S.C. § 1342(b); *see*

10   Storm Water Permit, Finding No. 15; *see also* 40 C.F.R. § 123.25.

11         28.    In order to discharge storm water lawfully in California, industrial

12   dischargers must secure coverage under the Storm Water Permit and comply with its

13   terms, or obtain and comply with an individual NPDES permit. Storm Water Permit,

14   Finding No. 2. Prior to beginning industrial operations, dischargers are required to apply

15   for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply

16   with the Terms of the General Permit to Discharge Storm Water Associated with

17   Industrial Activity ("NOI") to the State Board. *See* Storm Water Permit, Finding No. 3.

18         29.    Violations of the Storm Water Permit are violations of the Clean Water Act.

19   *See* Storm Water Permit, Section C(1) (Standard Provisions).

20   **C.    The Storm Water Permit's Discharge Prohibitions, and Effluent**

21   **Limitations.**

22         30.    Except as authorized by the Storm Water Permit, Discharge Prohibition A(1)

23   of the Storm Water Permit prohibits permittees from discharging materials other than

24   storm water (non-storm water discharges) either directly or indirectly to waters of the

25   United States. Prohibited non-storm water discharges must be either eliminated or

26   permitted by a separate NPDES permit. *See* Storm Water Permit, Discharge Prohibition

27   A(1).

28         31.    Effluent Limitation (B)(3) of the Storm Water Permit requires dischargers to

Complaint                      7

reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform.

32.     EPA's National Pollutant Discharge Elimination System (NPDES) Storm Water Multi-Sector General Permit for Industrial Activities ("2008 MSGP Permit") sets numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). Discharges from an industrial facility containing pollutant concentrations above EPA Benchmarks indicate that the facility has not adequately developed and/or implemented Best Management Practices ("BMPs") that meet BAT for toxic pollutants and BCT for conventional pollutants. *See* 2008 MSGP Permit, 73 Fed. Reg. 56572 (September 29, 2008).

33.     Discharges with pollutant levels that exceed EPA Benchmarks indicate BMPs are not developed and/or implemented to achieve BAT/BCT, in violation of Effluent Limitation B(3). *See* 2008 MSGP Permit, at 56574.

**C.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

34.     Section A(1) and Provision E(2) of the Storm Water Permit require dischargers to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") that complies with the requirements of the Storm Water Permit prior to commencing industrial activities.

35.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of

Complaint                                    8

pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section A(2).

36.   Section A(3) of the Storm Water Permit requires a discharger to name the members of its on-site Storm Water Pollution Prevention Team and to indicate each team member's responsibilities in developing, implementing, and revising the SWPPP to ensure compliance with the Storm Water Permit.

37.   Section A(4) of the Storm Water Permit requires that the SWPPP include a site map that contains: the facility boundaries, storm water drainage areas and directions of flow for each drainage area, on-site surface water bodies, nearby water bodies, areas of soil erosion, and municipal storm drain inlets where the facility's storm water discharges may be received (Section A(4)(a)); the location of the storm water collection, conveyance and discharge system and structural control measures that affect storm water discharges (Section A(4)(b)); an outline of all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures (Section (4)(c)); locations where materials are directly exposed to precipitation and where significant spills or leaks have occurred (Section A(4)(d)); and areas of industrial activity, including areas that are actual and potential pollutant sources (Section A(4)(e)).

38.   Section A(5) of the Storm Water Permit requires that the SWPPP include a list of significant materials handled and stored at the site.

39.   Section A(6)(a) of the Storm Water Permit requires that the SWPPP include a narrative description of the facility's industrial activities, associated potential pollutant sources, and potential pollutants that could be discharged in storm water discharges.

40.   Section A(6)(b) of the Storm Water Permit requires that the SWPPP include a summary of all areas of industrial activities, potential pollutant sources, and potential pollutants.

41.   Section A(7)(a) of the Storm Water Permit requires that the SWPPP include a narrative assessment of all industrial activities and potential pollutant sources to determine which areas of the facility are likely sources of pollutants and which pollutants

1    are likely to be present in the storm water discharges. Section A(7)(b) of the Storm Water

2    Permit requires that the SWPPP include a summary of the areas of the facility that are

3    likely sources of pollutants and the corresponding pollutants likely to be present in storm

4    water discharges.

5        42.    Section A(8) of the Storm Water Permit requires that the SWPPP include a

6    narrative description of the storm water BMPs to be implemented at the facility for each

7    potential pollutant and its source. Dischargers must develop and implement structural

8    and/or non-structural BMPs to reduce or prevent pollutants in storm water discharges.

9    Storm Water Permit, Sections A(8)(a) and (b).

10       43.    Section A(9) of the Storm Water Permit requires the discharger to evaluate

11   the SWPPP on an annual basis and revise it as necessary to ensure compliance with the

12   Storm Water Permit. Sections A(9)(a)-(c) of the Storm Water Permit also require that the

13   discharger conduct an annual comprehensive site compliance evaluation that includes a

14   review of all visual observation records, inspection reports and sampling and analysis

15   results, a visual inspection of all potential pollutant sources for evidence of, or the

16   potential for, pollutants entering the drainage system, a review and evaluation of all

17   BMPs to determine whether the BMPs are adequate, properly implemented and

18   maintained, or whether additional BMPs are needed, and a visual inspection of equipment

19   needed to implement the SWPPP. Section A(9)(d) of the Storm Water Permit requires

20   that the discharger submit an evaluation report that includes an identification of personnel

21   performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a

22   schedule for implementing SWPPP revisions, any incidents of non-compliance and the

23   corrective actions taken, and a certification that the discharger is in compliance with the

24   Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of

25   compliance cannot be provided, the discharger must explain in the evaluation report why

26   the facility is not in compliance with the Storm Water Permit. *Id.*, Section A(9)(d). The

27   evaluation report shall be submitted as part of the Annual Report specified in Section

28   B(14) of the Storm Water Permit. *Id.*

Complaint                    10

44.    Section A(10) of the Storm Water Permit requires that the discharger revise the SWPPP as necessary prior to changes in industrial activities, or as otherwise required by the Storm Water Permit.

**D.    The Storm Water Permit's Monitoring and Reporting Requirements**

45.    Provision E(3) and Section B(1) of the Storm Water Permit require dischargers to develop and implement a Monitoring and Reporting Program ("M&RP") prior to commencing industrial activities.

46.    The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Sections B(2)(a) and B(2)(b).

47.    The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. Storm Water Permit, Section B(2)(c) and B(2)(d).

48.    Section B(2)(d) requires that the M&RP "shall be revised" as necessary to ensure compliance with the Storm Water Permit.

49.    Section B(4)(a) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges during the first hour of discharge and at all discharge locations during the Wet Season (defined as October 1 – May 30).

50.    Section B(4)(c) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. This same section requires dischargers to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. Section B(4)(c) of the Storm Water Permit also requires dischargers to revise the SWPPP, as necessary, and implement the revisions to ensure that BMPs are effectively reducing and/or eliminating

1   pollutants at the facility.

2        51.     Sections B(5) and B(7) of the Storm Water Permit require dischargers to

3   visually observe and collect samples of storm water discharges from all locations where

4   storm water is discharged.

5        52.     Section B(5)(a) of the Storm Water Permit requires dischargers to collect

6   storm water samples during the first hour of discharge from the first storm event of the

7   Wet Season and at least one other storm event in the Wet Season. All storm water

8   discharge locations must be sampled. *See* Storm Water Permit, Section B(5)(a). Facility

9   operators that do not collect samples from the first storm event of the Wet Season are still

10  required to collect samples from two other storm events of the Wet Season and must

11  explain in the Annual Report why the first storm event was not sampled. *See id*.

12       53.     Section B(5)(b) requires that sampling conducted pursuant to the Storm

13  Water Permit occur during scheduled facility operating hours that are preceded by at least

14  three (3) working days without storm water discharge.

15       54.     Section B(5)(c)(i) of the Storm Water Permit requires dischargers to analyze

16  each sample for pH, specific conductance ("SC"), TSS, and total organic carbon

17  ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

18       55.     Section B(5)(c)(ii) of the Storm Water Permit requires dischargers to

19  analyze each sample for toxic chemicals and other pollutants likely to be present in

20  significant quantities in the storm water discharged from the facility.

21       56.     Section B(5)(c)(iii) and Table D of the Storm Water Permit require facilities

22  classified as Standard Industrial Classification ("SIC") code 3259, such as the MCA

23  Facility, to also analyze storm water samples for aluminum.

24       57.     Section B(5)(c)(iv) of the Storm Water Permit requires dischargers to

25  analyze samples for other parameters as required by the Regional Board.

26       58.     Section B(14) of the Storm Water Permit requires that dischargers submit an

27  Annual Report to the applicable Regional Board by July 1 of each year. The Annual

28  Report must include a summary of visual observations and sampling results, an

Complaint                          12

1   evaluation of the visual observations and sampling and analysis results, laboratory

2   reports, the annual comprehensive site compliance evaluation report specified in Section

3   A(9), an explanation of why a facility did not implement any activities required, and the

4   records specified in Section B(13).

5   **IV.    PARTIES**

6       **A.    Inland Empire Waterkeeper and Orange County Coastkeeper.**

7       59.    Orange County Coastkeeper is a non-profit public benefit corporation

8   organized under the laws of the State of California. Orange County Coastkeeper's office

9   is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

10       60.    Inland Empire Waterkeeper is a program of Orange County Coastkeeper.

11   Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D,

12   Riverside, California 92506.

13       61.    Together, Inland Empire Waterkeeper and Orange County Coastkeeper have

14   over 2,000 members who live and/or recreate in and around the Santa Ana River

15   watershed. Waterkeeper is dedicated to the preservation, protection, and defense of the

16   environment, wildlife, and natural resources of local surface waters. To further these

17   goals, Waterkeeper actively seeks federal and state agency implementation of the Clean

18   Water Act and, where necessary, directly initiates enforcement actions on behalf of itself

19   and others.

20       62.    Waterkeeper members use and enjoy the Santa Ana River and its tributaries

21   for fishing, boating, swimming, bird watching, picnicking, viewing wildlife, sailing,

22   kayaking, hiking, and engaging in scientific study, including monitoring activities.

23       63.    Discharges of polluted storm water and non-storm water from the MCA

24   Facility degrade water quality and harm aquatic life in the Santa Ana River and its

25   tributaries, and impair Waterkeeper's members' use and enjoyment of those waters.

26       64.    The violations of the Storm Water Permit and Clean Water Act at the MCA

27   Facility are ongoing and continuous. Thus, the interests of Waterkeeper's members have

28   been, are being, and will continue to be adversely affected by Defendant's failure to

1    comply with the Storm Water Permit and the Clean Water Act.

2        **B.    The MCA Facility Owners and/or Operators.**

3        65.    Waterkeeper is informed and believes, and thereon alleges, that Maruhachi

4    Ceramics of America, Inc. is an owner of the MCA Facility.

5        66.    Waterkeeper is informed and believes, and thereon alleges, that Delilah

6    Properties, Inc., is an owner of the property on which the MCA Facility lies.

7        67.    Waterkeeper is informed and believes, and thereon alleges, that Maruhachi

8    Ceramics of America, Inc. has owned the MCA Facility since at least May 14, 2009.

9        68.    Waterkeeper is informed and believes, and thereon alleges, that Maruhachi

10   Ceramics of America, Inc. is an operator of the MCA Facility.

11       69.    Waterkeeper is informed and believes, and thereon alleges, that Delilah

12   Properties, Inc., is an owner of the MCA Facility.

13       70.    Waterkeeper is informed and believes, and thereon alleges, that Maruhachi

14   Ceramics of America, Inc. has operated the MCA Facility since at least May 14, 2009.

15       71.    Waterkeeper is informed and believes, and thereon alleges, that Delilah

16   Properties, Inc., has owned the MCA Facility since at least May 14, 2009.

17       72.    Waterkeeper is informed and believes, and thereon alleges, that Maruhachi

18   Ceramics of America, Inc. is an active corporation registered in California.

19       73.    Waterkeeper is informed and believes, and thereon alleges, that the name

20   and address of the Registered Agent for Maruhachi Ceramics of America, Inc., is

21   Yoshihiro Suzuki, whose address is listed as at 1985 Sampson Avenue, Corona,

22   California 92879.

23       74.    Waterkeeper is informed and believes, and thereon alleges, that Delilah

24   Properties, Inc. is an active corporation registered in California.

25       75.    Waterkeeper is informed and believes, and thereon alleges, that the name

26   and address of the Registered Agent for Delilah Properties, Inc., is Yoshihiro Suzuki,

27   whose address is listed as 1985 Sampson Avenue, Corona, California 92879.

28       76.    Waterkeeper refers to Maruhachi Ceramics of America, Inc. and Delilah

Complaint                          14

1  Properties, Inc. herein as the "MCA Facility Owners and/or Operators."

2  **V.**   **FACTUAL BACKGROUND**

3      **A.**   **Facility Site Description**

4      77.   Waterkeeper is informed and believes, and thereon alleges, that the MCA

5  Facility is a clay tile manufacturer and distributor.

6      78.   Waterkeeper is informed and believes, and thereon alleges, that there are at

7  least three (3) buildings at the Facility: one (1) administration building; one (1) ceramic

8  tile factory building; and one (1) cottage.

9      79.   Waterkeeper is informed and believes, and thereon alleges, that the ceramic

10  tile factory building is referred to in the SWPPP site map as "Exist Building Product

11  Manufacturing" (hereinafter referred to as "Product Manufacturing Building").

12      80.   Waterkeeper is informed and believes, and thereon alleges, that the SWPPP

13  site map identifies the cottage, but the narrative portions of the SWPPP fail to provide

14  additional details about the specific industrial activities, or how, if any, the industrial

15  processes within or near the cottage are conducted.

16      81.   Waterkeeper is informed and believes, and thereon alleges, that there is one

17  (1) parking lot at the MCA Facility. The parking lot is located to the northeast corner of

18  the facility, near the administrative building.

19      82.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

20  includes an uncovered 500-gallon above ground diesel fuel tank.

21      83.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

22  also includes an outdoor shipping and receiving area and uncovered areas throughout the

23  Facility where fueling and unprocessed and processed materials are stored.

24      84.   Waterkeeper is informed and believes, and thereon alleges, that: (1) the

25  Material Handling Area is located in the north corner of the property, near SR-91; (2) the

26  Raw Material Storage Area is beside the Material Handling Area; (3) the Product

27  Manufacturing Building borders the Materials Handling Area and Raw Material Storage

28  Area; (4) the administrative building is located in the southeast edge of the property

1   facing Sampson Avenue; and (5) the 500-gallon above ground diesel fuel tank is outdoors

2   adjacent to the northeast corner of the Product Manufacturing Building.

3       85.    The Facility is bordered by SR-91 to the northwest and Sampson Avenue to

4   the southeast, Gibson Avenue to the northeast, and an industrial facility on the southwest.

5       86.    The points of egress/ingress to the MCA Facility include three (3) driveways

6   leading to Sampson Avenue. Driveway 1 is the northern most driveway on Sampson

7   Avenue and leads to the Raw Material Storage Area and the Material Handling Area,

8   which are beside the Product Manufacturing Building. Driveways 2 and 3 lead from

9   Sampson Avenue to the administrative building and the parking lot.

10      **B.    The MCA Facility's Storm Water Permit Coverage.**

11      87.    Information available to Waterkeeper indicates that the MCA Facility

12  Owners and/or Operators submitted an NOI for the MCA Facility on or about November

13  8, 1992 ("1992" NOI).

14      88.    The 1992 NOI list the Facility operator as "Maruhachi Ceramics of

15  America."

16      89.    The 1992 NOI list the Facility location as "1985 Sampson Ave, Corona CA

17  92879."

18      90.    The 1992 NOI indicates the MCA Facility Owners and/or Operators applied

19  for Storm Water Permit coverage for eight (8) acres.

20      91.    The State Board's electronic database, called the Storm Water Multiple

21  Application & Report Tracking System ("SMARTS"), lists the current MCA Facility

22  Waste Discharge Identification ("WDID") number as 8 33I009160.

23      92.    SMARTS lists the MCA's coverage under the Storm Water Permit as

24  "Active."

25      93.    Information available to Waterkeeper indicates that the 1992 NOI lists the

26  SIC code for the MCA Facility as 3259 (Structural Clay Products, not elsewhere

27  classified).

28      94.    Facilities classified as SIC code 3259 must obtain Storm Water Permit

Complaint                                  16

1  coverage for the entire facility. *See* Storm Water Permit, Attachment 1, Section 2.

2      95.    Waterkeeper is informed and believes, and thereon alleges, that industrial

3  activities are exposed to storm water at the MCA Facility, including, but not limited to,

4  receiving clay; unloading clay; grinding clay; dust suppression; mixing clay with water;

5  shaping clay; drying clay; storing raw materials and finished products; storage of

6  vehicles, and equipment; storage of vehicles and equipment, storage of materials

7  associated with clay and tile storage and transfer; vehicle maintenance; and vehicle

8  fueling.

9      **C.    Defendant's SWPPP and M&RP for the MCA Facility.**

10      96.    In a February 20, 2014 letter to the Regional Board, Waterkeeper requested

11  a copy of the current SWPPP and M&RP for the MCA Facility.

12      97.    In a March 30, 2014 email to the MCA Facility Owners and/or Operators,

13  the Regional Board requested a copy of the current Facility SWPPP.

14      98.    On or about March 30, 2014, the Regional Board provided Waterkeeper with

15  a copy of the SWPPP and M&RP that it received from the MCA Facility Owners and/or

16  Operators in response to its February 20, 2014 letter.

17      99.    The SWPPP and M&RP provided to Waterkeeper by the Regional Board on

18  or about March 30, 2014 is dated February 23, 2001.

19      100.  Waterkeeper is informed and believes, and thereon alleges, that the SWPPP

20  and M&RP dated February 23, 2001 is the current SWPPP and M&RP for the Facility.

21      **D.    Industrial Activities, Pollutant Sources, Pollutants, and BMPs at the**

22          **MCA Facility.**

23      101.  Waterkeeper is informed and believes, and thereon alleges, that the

24  Facility's industrial activities and areas are pollutant sources and include, but are not

25  limited to: receiving clay; unloading clay; grinding clay; mixing clay with water; shaping

26  clay; drying clay; glazing clay; firing clay; shipping, receiving and moving clay products

27  around the Facility; vehicle and equipment maintenance; vehicle and equipment cleaning

28  operations; vehicle and equipment storage; vehicle and equipment fueling; vehicle and

1   equipment painting; storage of materials associated with equipment and vehicle

2   maintenance; storage hazardous waste storage; and dust suppression.

3       102.   Waterkeeper is informed and believes, and thereon alleges, that industrial

4   activities occur throughout the MCA Facility outdoors without adequate cover to prevent

5   storm water and non-storm water exposure to pollutant sources.

6       103.   Waterkeeper is informed and believes, and thereon alleges, that industrial

7   activities occur throughout the MCA Facility outdoors without secondary containment or

8   other adequate treatment measures to prevent polluted storm water and non-storm water

9   from discharging from the Facility.

10       104.   Waterkeeper is informed and believes, and thereon alleges, that the Facility

11   SWPPP site map does not indicate and/or label all impervious areas of the MCA Facility,

12   including, for example the outline of the gravel area on the site map.

13       105.   Section C of the Facility SWPPP lists the employee positions that are

14   responsible for implementing BMPs in each area of the MCA Facility. Waterkeeper is

15   informed and believes, and thereon alleges, that the MCA Facility SWPPP does not

16   clearly identify the General Permit-related responsibilities, duties, and activities of each

17   team member.

18       106.   Section D of the Facility SWPPP describes the "operations center" of the

19   Facility and references "Figure A." Waterkeeper is informed and believes, and thereon

20   alleges, that "Figure A" is the Facility site map, and that the Site Map does not include all

21   industrial information. For example, the SWPPP Site Map fails to outline all impervious

22   areas, municipal storm drain inlets, or the direction of flow of each drainage area.

23       107.   Section F of the SWPPP provides a "Description of Potential Pollutant

24   Sources" at the Facility. Waterkeeper is informed and believes, and thereon alleges, that

25   the SWPPP does not describe all industrial activities and potential pollutant sources, as,

26   for example, the SWPPP fails to identify and/or describe the Facility's material handling

27   and storage areas, including spill or leak prevention and response procedures,

28   containment structures or containment capacity.

Complaint                18

108.    Section G of the SWPPP describes the "Industrial Process" at the Facility, which among other requirements, narratively describes storm water best management practices ("BMPs"). Waterkeeper is informed and believes, and thereon alleges, that the SWPPP does not describe structural BMPs, as, for example, the SWPPP states the presence of an onsite catchment basin that drains to the Arlington Channel, but does not mention this catchment basin in the narrative portions of the SWPPP.

109.    Section G of the SWPPP states "sediments consisting of clay materials have mixed with storm water and have been discharged from the site." Waterkeeper is informed and believes, and thereon alleges, that the Facility SWPPP does not identify the characteristics, approximate quantity of the material spilled or leaked, the approximate remaining quantity of materials that may be exposed to storm water or non-storm water discharges, nor does it reference the need for the SWPPP to be updated as appropriate.

110.    Waterkeeper is informed and believes, and thereon alleges, that pollutants associated with the MCA Facility include, but are not limited to: TSS; O&G; TOC; total dissolved solids ("TDS"); heavy metals, including, but not limited to, aluminum, iron, lead, copper, and zinc; trash and debris; gas, diesel, grease, anti-freeze, hydraulic fluids, brake fluids, lubricating products, fuel, oil, and fuel additives; paints; glazes; fugitive and other dust and dirt; and pH-affecting substances.

111.    Waterkeeper is informed and believes, and thereon alleges, that the Facility SWPPP includes no summary of all areas of industrial activities and the potential pollutants in a table resembling Table B in Section A(6)(b) of the Storm Water Permit.

112.    Waterkeeper is informed and believes, and thereon alleges, that the Facility SWPPP includes no adequate description of the Facility BMPs, analysis of the effectiveness of the BMPs, or a summary of the BMPs by pollutant source.

113.    Waterkeeper is informed and believes, and thereon alleges, that storm water sampling at the Facility demonstrates that the MCA Facility's storm water discharges contain concentrations of pollutants above the Benchmark Levels, including but not limited to pH, aluminum, TSS, O&G, TOC, and TDS.

114.   Waterkeeper is informed and believes, and thereon alleges, that the repeated and significant exceedances of Benchmark Levels demonstrate that the MCA Facility Owners and/or Operators failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

115.   The Facility SWPPP is dated February 23, 2001. Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators have failed and continue to fail to adequately revise the SWPPP, despite repeated and significant concentrations of pollutants in the Facility's storm water discharges, changes to the Facility's training program, and other changes and events requiring revision.

**E.      Discharge Locations and Storm Water Conveyance System at the MCA Facility.**

116.   The MCA Facility Owners and/or Operators report that there are four (4) discharge points at the MCA Facility, which are identified in the Annual Reports as Drain #1 (Drain 1), Drain #2 (Drain 2), Drain #3 (Drain 3), and Drain #4 (Drain 4).

117.   Waterkeeper is informed and believes, and thereon alleges, that Drains 1-4 are not numerically identified in the SWPPP or the M&RP.

118.   The Facility's 2012-2013 Annual Report indicates Drain 1 is located in the north portion of the facility near the SR-91 freeway at the end of Driveway 1.

119.   The Facility's 2012-2013 Annual Report indicates that Drain 2 is near the east driveway in the middle of Driveway 1.

120.   The Facility's 2012-2013 Annual Report indicates that Drain 3 is near the cottage on Driveway 1.

121.   The Facility's 2012-2013 Annual Report indicates that Drain 4 is in the south portion of the Facility near the main gate, south of Driveway 3.

122.   The Facility SWPPP indicates that storm water from the entire Facility, except a portion of Driveway 1, is routed through Drains 1-4 to underground piping which leads to the Arlington Channel.

123.   The MCA Facility SWPPP site map indicates that the storm water conveyance system includes one (1) sump pump.

124.   Waterkeeper is informed and believes, and thereon alleges, that the sump pump is located in the north of the property between the SR-91 border and the "Exist Dock," near the Product Manufacturing Building.

125.   Waterkeeper is informed and believes, and thereon alleges, that the sump pump collects run-on from SR-91, as well as some water from the "Finished Product Storage Area," to be discharged at Drain 4.

126.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility SWPPP site map does not include, among other issues, an outline of all storm water drainage areas within the Facility boundaries, direction of flow for each drainage area, an outline of all impervious surfaces, areas of dust and particulate generating activities, or structural control measures that affect storm water discharges.

127.   Waterkeeper is informed and believes, and thereon alleges, that the pollutants associated with the Facility have been and continue to be tracked throughout the Facility, and trucks and vehicles track sediment, dirt, oil and grease, metal particles, and other pollutants off-site via Driveways 1-3.

**F.   The MCA Facility's Discharges to the Receiving Waters.**

128.   Waterkeeper is informed and believes, and thereon alleges, that pollutants from the MCA Facility discharge from the Facility discharge points to the municipal storm drain system that leads to the Arlington Flood Control Channel, Reach 1 of Temescal Wash, and to the Santa Ana River (hereinafter collectively referred to as the "Receiving Waters").

129.   Waterkeeper is informed and believes, and thereon alleges, that each of the Receiving Waters is a water of the United States, and/or a tributary to a traditionally navigable water.

130.   Waterkeeper is informed and believes, and thereon alleges, that polluted storm water and non-storm water discharges from the MCA Facility to the Receiving

Complaint                                21

1  Waters.

2  **G.   Defendant's Prohibited Non-Storm Water Discharges.**

3       131.  Waterkeeper is informed and believes, and thereon alleges, that water is used

4  for equipment washing in an unknown area of the Facility, and dust suppression in and

5  around the Raw Material Storage Area of the MCA Facility.

6       132.  The MCA Owners and/or Operators report in the Facility SWPPP that MCA

7  uses water to control dust at the Facility.

8       133.  Waterkeeper is informed and believes, and thereon alleges, that MCA uses

9  water for equipment washing and cleaning activities at the Facility.

10      134.  Waterkeeper is informed and believes, and thereon alleges, that the use of

11  water for dust suppression is an ongoing business practice at the MCA Facility.

12      135.  Waterkeeper is informed and believes, and thereon alleges, that the use of

13  water for equipment washing and cleaning activities is an ongoing business practice at

14  the MCA Facility.

15      136.  Waterkeeper is informed and believes, and thereon alleges, that water used

16  for dust suppression results in non-storm water discharges from the Facility to Receiving

17  Waters.

18      137.  Waterkeeper is informed and believes, and thereon alleges, that water used

19  for equipment washing and cleaning activities results in non-storm water discharges from

20  the Facility to Receiving Waters.

21      138.  Waterkeeper is informed and believes, and thereon alleges, that non-storm

22  water discharges resulting dust suppression at the MCA Facility are not included on the

23  list of authorized non-storm water discharges in Special Conditions D(1) of the Storm

24  Water Permit.

25      139.  Waterkeeper is informed and believes, and thereon alleges, that the MCA

26  Facility Owners and/or Operators have not obtained a separate NPDES permit for non-

27  storm water discharges resulting from dust suppression at the MCA Facility.

28      140.  Waterkeeper is informed and believes, and thereon alleges, that BMPs have

Complaint                    22

not been developed and/or implemented to prevent non-storm water from discharging from the MCA Facility.

141. Waterkeeper is informed and believes, and thereon alleges, that the SWPPP includes no description or assessment of non-storm water discharges generated by the use of water to control dust at the Facility.

142. Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility SWPPP does not describe the quantity, frequency, and characteristics of the non-storm water discharges that occur at the MCA Facility.

### H.    Defendant's Sampling, Reporting, and Monitoring.

143. Via a Public Records Act request to the Regional Board, Waterkeeper obtained an Annual Report for the Facility dated July 1, 2009. Waterkeeper is informed and believes, and thereon alleges, that this is the 2008-2009 Annual Report for the Facility.

144. Via a Public Records Act request to the Regional Board, Waterkeeper obtained an Annual Report for the Facility dated July 1, 2010. Waterkeeper is informed and believes, and thereon alleges, that this is the 2009-2010 Annual Report for the Facility.

145. Via a Public Records Act request to the Regional Board, Waterkeeper obtained an Annual Report for the Facility dated June 30, 2011. Waterkeeper is informed and believes, and thereon alleges, that this is the 2010-2011 Annual Report for the Facility.

146. Via a Public Records Act request to the Regional Board, Waterkeeper obtained an Annual Report for the Facility dated June 30, 2012. Waterkeeper is informed and believes, and thereon alleges, that this is the 2011-2012 Annual Report for the Facility.

147. Via a Public Records Act request to the Regional Board, Waterkeeper obtained an Annual Report for the Facility dated June 26, 2013. Waterkeeper is informed and believes, and thereon alleges, that this is the 2012-2013 Annual Report for the

Facility.

148.   Via SMARTS access through the State Water Resources Control Board, Waterkeeper obtained an Annual Report for the Facility on July 2, 2014. Waterkeeper is informed and believes, and thereon alleges, that this is the 2013-2014 Annual Report for the Facility.

149.   Waterkeeper refers to the above-described documents collectively as the "Annual Reports."

150.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators failed to conduct and/or report all required visual observations of storm water discharges since at least the 2009-2010 Wet Season.

151.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators failed to collect storm water samples from two storm events per Wet Season despite the occurrence of at least two qualifying rain events since at least the 2009-2010 Wet Season.

152.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators failed to collect storm water samples from the first storm event of the Wet Season since at least the 2009-2010 Wet Season.

153.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators failed to analyze storm water samples for all required parameters, such as specific conductance, since at least the 2008-2009 Wet Season.

154.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators failed to analyze all storm water samples collected for all required parameters, including pollutants likely to be present in the MCA Facility storm water discharges in significant quantities, such as copper, since at least the 2008-2009 Wet Season.

155.   Waterkeeper is informed and believes, and thereon alleges, that for at least each of the past six (6) Wet Seasons addressed in the Annual Reports the Facility Owners and/or Operators have certified that the Facility is in compliance with the Storm Water

Permit.

156.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners' and/or Operators' certifications of compliance in the Annual Reports were erroneous because the Facility Owners and/or Operators had not revised the Facility SWPPP to achieve compliance with the Storm Water Permit.

157.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners' and/or Operators' certifications of compliance in the Annual Reports were erroneous because the Facility Owners and/or Operators have not revised the Facility M&RP to achieve compliance with the Storm Water Permit.

158.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators failed to include a summary or evaluation of its visual observations and sampling and analysis results in the Annual Reports.

159.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators failed to provide explanations in the Annual Reports as to why the first storm event of each Wet Season was not sampled since at least the 2009-2010 Wet Season.

160.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators failed to describe instances of the Facility's noncompliance with the Storm Water Permit in the Annual Reports, or descriptions of steps taken to prevent the recurrence of such noncompliance.

161.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators failed and continues to fail to submit written reports identifying what additional BMPs will be implemented.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitation B(3) and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

162.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

163.   Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

164.   Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the MCA Facility occur every time storm water discharges from the MCA Facility.

165.   The MCA Facility Owners and/or Operators violate and will continue to violate Effluent Limitation B(3) of the Storm Water Permit each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the MCA Facility.

166.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners' and/or Operators' violations of Effluent Limitation B(3) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

167.   Each and every time the MCA Facility Owners and/or Operators discharge contaminated storm water from the MCA Facility in violation of Effluent Limitation B(3) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

168.   By committing the acts and omissions alleged above, the MCA Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 14, 2009 to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

169.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm

Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

### SECOND CAUSE OF ACTION

**Defendant's Discharges of Non-Storm Water in Violation of the Storm Water Permit's Discharge Prohibition A(1) and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

170.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

171.   Waterkeeper is informed and believes, and thereon alleges, that prohibited non-storm water discharges have discharged and continue to discharge from the MCA Facility.

172.   Waterkeeper is informed and believes, and thereon alleges, that each and every dust suppression water is not prevented from discharging from the Facility to the Receiving Waters is a violation of Discharge Prohibition A(1) of the Storm Water Permit.

173.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners' and/or Operators' violations of Discharge Prohibition A(1) are ongoing and continuous.

174.   Each and every violation of Discharge Prohibition A(1) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

175.   By committing the acts and omissions alleged above, the MCA Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 14, 2009 to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

176.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm

Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of Section A and Provision E(2) of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

177.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

178.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators have failed and continue to fail to develop an adequate SWPPP for the MCA Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

179.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators have failed and continues to fail to adequately implement a SWPPP for the MCA Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

180.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators have failed and continue to fail to adequately revise a SWPPP for the MCA Facility, in violation of Sections A(9) and A(10) of the Storm Water Permit.

181.   The MCA Facility Owners and/or Operators have been in violation of Section A and Provision E(2) of the Storm Water Permit at the MCA Facility every day from May 14, 2009 to the present.

182.   The MCA Facility Owner's and/or Operator's violations of Section A and Provision E(2) of the Storm Water Permit and the CWA at the MCA Facility are ongoing and continuous.

183.   The MCA Facility Owners and/or Operators will continue to be in violation of Section A and Provision E(2) of the Storm Water Permit and the CWA each and every day the MCA Facility Owners and/or Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

184.   Each and every violation of the Storm Water Permit's SWPPP requirements at the MCA Facility is a separate and distinct violation of the CWA.

185.   By committing the acts and omissions alleged above, the MCA Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 14, 2009 to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

186.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against the Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Program in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

187.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

188.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators have failed and continue to fail to develop an adequate M&RP for the MCA Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

189.   Waterkeeper is informed and believes, and thereon alleges, that the MCA

Facility Owners and/or Operators have failed and continue to fail to adequately implement an M&RP for the MCA Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

190.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators have failed and continue to fail to adequately revise an M&RP for the MCA Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

191.   The MCA Facility Owners and/or Operators have been in violation of the Section B and Provision E(3) of the Storm Water Permit at the MCA Facility every day from May 14, 2009 to the present.

192.   The MCA Facility Owners' and/or Operators' violations of Section B and Provision E(3) of the Storm Water Permit and the CWA at the MCA Facility are ongoing and continuous.

193.   The MCA Facility Owners and/or Operators will continue to be in violation of Section B and Provision E(3) the Storm Water Permit and the CWA each and every day it fails to adequately develop, implement, and/or revise an M&RP for the MCA Facility.

194.   Each and every violation of the Storm Water Permit's M&RP requirements at the MCA Facility is a separate and distinct violation of the CWA.

195.   By committing the acts and omissions alleged above, the MCA Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 14, 2009 to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

196.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray judgment against the Defendant as set forth

hereafter.

### FIFTH CAUSE OF ACTION

**Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

197.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

198.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections B(14), C(9), and C(10) of the Storm Water Permit.

199.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners' and/or Operators' Annual Reports failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Section B(14) of the Storm Water Permit.

200.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners' and/or Operators' Annual Reports were, and will continue to be, inaccurate and/or failed and continue to fail to include complete annual comprehensive site evaluations, in violation of Sections A(9) and B(14) of the Storm Water Permit.

201.   Waterkeeper is informed and believes, and thereon alleges, that MCA's Annual Reports were, and will continue to be, inaccurate in stating that the SWPPP's BMPs address existing potential pollutant sources, in violation of Sections A(6) and B(14) of the Storm Water Permit.

202.   Waterkeeper is informed and believes, and thereon alleges, that the MCA Facility Owners and/or Operators have failed and continue to fail to submit complete Annual Reports to the Regional Board, in violation of Sections B(14), C(9), C(10) and C(11) of the Storm Water Permit.

203.   The MCA Facility Owners and/or Operators have been in violation of

1  Sections B(14), C(9), C(10), and/or C(11) of the Storm Water Permit and CWA every
2  day since at least May 14, 2009.

3  204.  Waterkeeper is informed and believes, and thereon alleges, that the MCA
4  Facility Owners and/or Operators failed and continues to fail to submit written reports
5  identifying what additional BMPs will be implemented so that the MCA Facility's
6  discharges achieve BAT/BCT.

7  205.  The MCA Facility Owners and/or Operators have been in violation of the
8  reporting requirements of the Storm Water Permit each day it has operated the MCA
9  Facility without reporting as required by Section B(14) of the Storm Water Permit.

10  206.  The MCA Facility Owners and/or Operators violations of the Reporting
11  Requirements of the Storm Water Permit and the CWA are ongoing and continuous.

12  207.  The MCA Facility Owners and/or Operators have been in violation of
13  Section B(14) of the Storm Water Permit every day since at least May 14, 2009.

14  208.  The MCA Facility Owner's and/or Operator's violations of the reporting
15  requirements of the Storm Water Permit and the CWA are ongoing and continuous.

16  209.  By committing the acts and omissions alleged above, the MCA Facility
17  Owners and/or Operators are subject to an assessment of civil penalties for each and
18  every violation of the CWA occurring from May 14, 2009 to the present, pursuant to
19  sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

20  210.  An action for injunctive relief under the CWA is authorized by 33 U.S.C.
21  § 1365(a). Continuing commission of the acts and omissions alleged above would
22  irreparably harm Waterkeeper and the citizens of the State of California, for which harm
23  Waterkeeper has no plain, speedy, or adequate remedy at law.

24  WHEREFORE, Plaintiffs pray judgment against the Defendant as set forth
25  hereafter.

26  **VII.  RELIEF REQUESTED**

27  211.  Plaintiffs respectfully request that this Court grant the following relief:

28  a.  A Court order declaring Defendant to have violated and to be in violation of

Complaint                                              32

1 the Storm Water Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C.

2 § 1311(a), for its discharges of pollutants not in compliance with the Storm Water Permit

3 and violations of the substantive and procedural requirements of the Storm Water Permit;

4      b.    A Court order enjoining Defendant from discharging pollutants without an

5 NPDES permit;

6      c.    A Court order requiring Defendant to implement affirmative injunctive

7 measures designed to eliminate Defendant's violations of the substantive and procedural

8 requirements of the Storm Water Permit and the Clean Water Act;

9      d.    A Court order assessing civil monetary penalties for each violation of the

10 CWA at $37,500 per day per violation for violations occurring since May 14, 2009, as

11 permitted by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4;

12      e.    A Court order awarding Plaintiffs their reasonable costs of suit, including

13 attorney, witness, expert, and consultant fees, as permitted by section 505(d) of the Clean

14 Water Act, 33 U.S.C. § 1365(d); and

15      f.    Any other relief as this Court may deem appropriate.

16 //

17 Dated: July 24, 2014              Respectfully submitted,

18

19

20                                 _____

21                                   Colin Kelly

22                                   Attorney for Plaintiffs

23                                   Inland Empire Waterkeeper and Orange

                                  County Coastkeeper

24

25

26

27

28